Margaret Brecht and John M. Ruegenberg, who survived Margaret Brecht, John M. Ruegenberg and Frederick Brecht, Executors of August F. Brecht, deceased, who was Assignee of Philip L. Schaefer, Jr., who was Assignee of Alfred E. Lowrey, Appellants, *v.* John McParland and Ellen M. McParland.

*Mortgage—Principal and agent—Evidence.*

On a scire facias sur mortgage, it appeared that the defendant applied to S.—an attorney at law, for a loan. The plaintiff was a client of S., and at S.'s request agreed to furnish the money. Plaintiff and defendant were never brought personally together, but it was agreed by plaintiff that S. should pay over the money to defendant, and receive the money back from the defendant and account to plaintiff for it. S. gave defendant, not only plaintiff's money, but other money of his own. The mortgage in suit had been given to one who furnished no money, but merely for convenience in raising money for defendant, and that attempt to raise money having failed, the mortgage, at S.'s request, was assigned to his clerk, as security for the advances. Defendant repaid the money advanced by plaintiff, but it was all embezzled by S.'s clerk without the knowledge of S. After the full amount of the plaintiff's loan had been paid by defendant to S.'s clerk, S., without knowledge of the payment, assigned the mortgage to the plaintiff as security for what he supposed was still due him. *Held,* that as S. was the agent of the plaintiff to receive the money from defendant, and as he had received it, plaintiff could not recover on the mortgage.

Argued March 24, 1898. Appeal, No. 491, Jan. T., 1897, by plaintiffs, from judgment of C. P. No. 2, Phila. Co., Dec. T., 1896, No. 1291, on verdict for defendants. Before STERRETT, C. J., GREEN, WILLIAMS, DEAN and FELL, JJ. Affirmed.

Scire facias sur mortgage. Before WILTBANK, J.

The defendants pleaded payment with leave, etc.

The facts appear by the opinion of the Supreme Court.

The court charged in part as follows :

You will observe that up to the time the bond and mortgage passed to Philip L. Schaefer no money passed between these parties.   Mr. Brecht having died, and his executors having brought suit, they secured judgment whereby it was determined judicially that the money was due by John McParland and his wife to the personal representatives of Mr. Brecht, and thereupon certain proceedings were had, and in consequence thereof the judgment, by order of the court, was opened in order that there might be an investigation of the question, whether or not, after all, Mr. Brecht's personal representatives were entitled to any of that money ; and it was claimed on the part of the McParlands, the defendants here, that Mr. Brecht's representatives were not entitled to any of that money, because, in fact, the bond and the mortgage had been paid ; and that is the question for you to determine—whether or not, in point of fact, the bond has been paid, and the mortgage which secured it is thereby released, and should be satisfied.

This question has arisen from dealings between Mr. McParland and certain gentlemen whose names you have heard.   In the first place, you will remember Mr. McParland was the brother of Mr. Joseph McParland, and Mr. Joseph McParland was a contractor.   He had entered into contracts with the city of Philadelphia for the building of sewers, and it was a part of his arrangement with the city of Philadelphia that he should be paid for his sewers in what are called assessment bills.   That is to say, the property owners who benefited by the sewers would, under the law, be charged with a proportionate part of the cost of the sewers, and the contractor, Mr. McParland, was not to get his money from the city, but was to get it from the property owners who were obliged to pay according to assessment, and the procedure was, that when the work was done Mr. McParland was entitled to what are called assessment bills, which I may describe to you in that brief way.

Accordingly, as it was necessary under the circumstances, Joseph appearing to have no capital adequate to the purpose, that he should get money in advance in order to do his work

or look about for pecuniary assistance, he turned to Mr. Erricson, who was a man we may safely assume whose business it was to raise money. At all events, he undertook that duty for Mr. McParland, and he said substantially to Mr. McParland, "I will raise this money for you, but I must have some security," and thereupon Mr. Joseph McParland procured the assistance of his brother, Mr. John McParland, to secure this money. There were two bonds and mortgages, but you have only to do with one in this case. Mr. Lowrey was selected as the gentleman to whom the bonds should be given, who should be named as the party to whom the mortgage was to be made, and he took, as I have already told you, the bond and mortgage described. As I have said, no money passed at all. The object was that Mr. Erricson should procure money for Mr. McParland, and then turn over to the lender the bond and mortgage which would be the security for the payment of the debt, Mr. Lowrey being the gentleman who held the papers subject to the order, as it then stood, of Mr. Erricson. It was ascertained, however, that Mr. Erricson could not accomplish the purpose, and accordingly it became necessary that Mr. Joseph McParland should look to somebody else, and he and John McParland eventually made an arrangement with Mr. Gustav R. Schaefer, Mr. Gustav R. Schaefer having agreed that he would endeavor to raise this money and see that Mr. Joseph McParland was furnished with it. As, however, the bond and mortgage had already been created, it was also agreed that Mr. Lowrey, who held them, should transfer them to a person to be named by Gustav R. Schaefer, and he named his cousin, Mr. Philip L. Schaefer, as the party to whom Mr. Lowrey was to turn over the bond and mortgage; and Mr. Lowrey did, by assignment, turn over the bond and mortgage to Mr. Philip L. Schaefer; Mr. Philip L. Schaefer paying no money for them, but holding them subject to any such arrangement as Mr. Gustav R. Schaefer could make in the interest of John McParland. It so turned out that Mr. Gustav R. Schaefer had an acquaintance, Mr. August Brecht, who had money which from time to time he invested by the aid of Mr. Gustav R. Schaefer, and to him Mr. Schaefer sent the message that he would like to see him, and he opened this prospect of investment and finally procured from Mr. August Brecht the money—we will say $5,000

for the purposes of this case. He procured more money from Mr. August Brecht, but I will only indicate that which has relation to the bond and mortgage before you. Mr. August Brecht did loan the money to Mr. Gustav R. Schaefer, and Mr. Schaefer stated to him at the time he got the money from him that the security was good, in mortgages, etc., but he did not describe to Mr. Brecht what bond and mortgage he had to secure that fund. Mr. Brecht seems to have had so much confidence in Mr. Schaefer that he did not ask to see the paper, he did not demand the delivery of the paper, and did not, indeed, insist on anything more than a general statement that this loan would be secured by mortgages.

It is a question for you to determine whether or not up to that time Mr. Brecht had any knowledge at all of Mr. John McParland in the matter, or Mr. Joseph McParland. I say that I leave that question to you. You will determine that upon the proofs before you. At all events, all of Mr. Brecht's money, so far as we need to look to it in this case, was turned over to Mr. Gustav R. Schaefer upon the representations made to Mr. Brecht by Mr. Schaefer, and subsequently to that Mr. Gustav R. Schaefer did turn over that money to Mr. Joseph McParland.

The arrangement between Mr. Schaefer and Mr. Joseph McParland and also Mr. John McParland was, I think I may say, without question, but I leave that also to you, that the money was to be repaid out of what I have described as the assessment bills, and the arrangement was also that Mr. Schaefer was to collect the assessment bills. Mr. Joseph McParland was not to collect them; Mr. John McParland was not to collect them; but Mr. Gustav R. Schaefer was to take those assessment bills and collect the moneys on them. That was the arrangement between the McParlands, as I have told you, and Mr. Gustav R. Schaefer.

[There is some evidence that Mr. Brecht knew of that arrangement, but how soon he knew of it I leave to you to determine. After that Mr. Gustav R. Schaefer did collect more than enough moneys to repay this debt of $5,000; he did collect those moneys on the assessment bills that I have referred to, and if he had properly appropriated them by virtue of his arrangement with Mr. McParland and his brother, he would

have turned them over to Mr. August Brecht in full payment
of the debt, and his mortgage would then of right have been
to be satisfied; the debt would have been paid, the bond would
have been released, and the mortgage should have been satis-
fied.] [9]    The mortgage, the moment Mr. Brecht advanced
his money and the McParlands, one or either or both of them
availed themselves of that money, acquired full life and vigor,
so that it was in full force and effect against Mr. John McPar-
land. Up to that time it could not have been enforced against
him, but the moment they availed themselves of the proceeds,
Mr. John McParland and his wife became liable on the mort-
gage. So that you do not have to consider any question here
of consideration. The money, however, which was collected
by Mr. Gustav R. Schaefer on these assessment bills was not
paid to Mr. August Brecht, and for the purposes of this case
you will regard that money as having been misappropriated.
It was misappropriated at a time when Mr. Gustav R. Schaefer
was responsible for it, and accordingly, under the law, it was
the same as if he himself, Mr. Gustav R. Schaefer, individually
had misappropriated it. . . . Gustav R. Schaefer was, in a
sense, the representative of both these parties. . . . Did he
misappropriate this money as the agent of John McParland
and Joseph, his brother? If he did so, your verdict would be
in favor of the plaintiff. Did he misappropriate it as the agent
of August Brecht? If you find that he so did, then your ver-
dict must be for the defendant. . . .

Now, then, how are you to determine the character of Gustav
R. Schaefer at the time he made that misappropriation? You
will determine it upon the testimony of these people and upon
the legitimate conclusions that you draw from the facts which
are proved before you. [At a certain time, Schaefer (and in
speaking of Schaefer from now on, unless I otherwise indi-
cate, I mean Gustav R. Schaefer) at a certain time Schaefer had
the fund to pay that debt. He had it absolutely in his con-
trol.] [10] He says that he was not the attorney of McParland,
that he was the attorney of Brecht, and he raises the implication
that at the time of the misappropriation he held that fund as
the agent or attorney of Brecht, and that, accordingly, his mis-
appropriation of the fund was a misappropriation of Brecht's
money. If that is so, the defendants are entitled to your ver-

dict, because there is a payment to Brecht if you find that tes-
timony to be true. . . . Mr. Brecht appears to have said . . . .
that his advance to Mr. McParland or to Mr. Schaefer, put it as
we may elect to do under the proofs, was with the knowledge
that he was to be repaid from assessment bills, and that it was
his understanding that he was to be so paid.   His deposition
has been read to you twice—once in the course of the trial and
once in the course of the argument—and you will recall what
he said in that relation.   If you believe he did say that, that is
an important fact here, because, gentlemen, if all these parties
understood, if Mr. Brecht understood, and the Messrs. McPar-
land understood, and the agent of both of them (Schaefer)
understood that this money was to be repaid out of assessment
bills, and you find that to be the fact, then you must find a
verdict for the defendant, because it is undisputed that these
assessment bills have been paid.   Mr. Brecht has said what I
have referred to upon that head.   [When we come to Mr.
McParland we find that he and his brother expressly put Gus-
tav R. Schaefer in the position of one who had control of the
bond and mortgage for purposes of raising money on them, and
that they also put him in control of the assessment bills for the
purpose of paying the lender.   So that, with regard to the tes-
timony of the defendant and his brother, so far as they are to
be looked to to state what the arrangement was, there would
seem to be no doubt whatever that the assessment bills were to
pay the debt, and we know that the assessment bills did go to
Mr. Schaefer and were collected.] [11] . . . .

   I am asked to charge you, on the part of the plaintiff, as
follows :

   1. Under all the evidence in the case, the verdict must be
for the plaintiffs.   *Answer :* I decline so to charge. [1]

   2. The uncontradicted testimony in this case is that these
mortgages were originally created for the purpose of negotiation
to raise money, and were afterwards placed into Gustav R.
Schaefer's hand by Mr. McParland to handle as Schaefer pleased
or " dispose of them as he saw fit; " and that this authority
was never withdrawn.   The uncontradicted evidence further
shows that Brecht paid Gustav R. Schaefer $11,000 for Mc-
Parland, and that Brecht was never repaid any portion of this
money.   If the jury believe this evidence and so find, then all

the testimony as to whether Brecht expected Schaefer to return the money to him or looked directly to McParland, and all the evidence as to transactions between Schaefer and McParland becomes irrelevant and immaterial, and will not avail as a defense to this mortgage; and the verdict must be for the plaintiffs. *Answer:* I decline so to charge. [2]

3. When one person gives another his bond or mortgage to enable that other to raise money thereon, such bond or mortgage resembles accommodation paper. Want of consideration cannot be set up against such paper, even though the holder knew that it was made for the accommodation of the payee, for the reason that the object of issuing it was to raise money thereon. In such case there can be no defense to the bond and mortgage in the hands of a third party who paid value for it. It is immaterial, therefore, what is the state of the accounts between Schaefer and McParland. If the jury find from the evidence (and the evidence is uncontradicted), either Schaefer or McParland owed Brecht at the time of the assignment of the mortgage to him, a sum equal to or exceeding the principal of this mortgage, the verdict must be for the plaintiffs. *Answer:* I decline so to charge. [3]

4. The mortgage in suit having been placed in the hands of G. R. Schaefer by the defendants, for the purpose of getting a loan thereupon, and the loan being made by August F. Brecht, and the mortgage assigned to him, the said Brecht having paid the full amount of said mortgage unto the said G. R. Schaefer, who used the said money at the request of and under the order of the said defendant, and if subsequently G. R. Schaefer collected and received other moneys which belonged to the said defendant, but did not pay the said moneys over unto the said August F. Brecht, your verdict must be for the plaintiffs. *Answer:* I decline so to charge. [4]

5. Where one of two innocent persons is to suffer from the tortious act of a third, he who gave the aggressor the means of doing the wrong must alone bear the consequences of his act. In this case, if the jury find that the mortgage remained in Gustav R. Schaefer's hands, with the original authority to dispose of as he saw fit unrevoked, and afterwards assigned to Brecht in accordance with the original understanding between McParland and Schaefer, then the embezzlement of the money

by Schaefer must be borne by McParland, who gave Schaefer the means of doing the wrong, and the verdict must be for the plaintiffs. *Answer:* I decline so to charge, because it does not admit of the contingency of Brecht's having made Schaefer his agent to receive payment in one form or another. [5]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* among others were (1–5, 9–11) above instructions, quoting them.

*T. A. Fenstermaker* and *Frederick L. Breitinger*, for appellants.—The evidence admitted was wholly irrelevant, incompetent and immaterial.

The disappointed expectations, however great, of a creditor as to the manner in which his debtor will repay him have never yet been held an accord and satisfaction of the debt.

Defendants cannot complain, because the mortgage was used for the purpose intended: Weigley v. Conrade, 132 Pa. 147.

*Alex. Simpson, Jr.,* with him *Francis Shunk Brown,* for appellees.—No consideration was given at the time the mortgage was created, and none for either of the assignments of it.

Brecht was a client of Schaefer in this matter, and McParland was not.

The money McParland was to get was to be a loan by Schaefer, and not by Brecht.

The mortgage in suit was to be a security to Schaefer and not to Brecht, and only to secure the delivery of the assessment bills.

The assessment bills were to be taken in payment as so much cash.

Brecht and McParland never met in connection with the matter until long after all the money had been loaned by Schaefer and repaid to him.

OPINION BY MR. JUSTICE GREEN, October 17, 1898:

This was a scire facias on a mortgage, and the only matter in controversy was its payment. The facts were peculiar in some respects, but they were not complicated, nor difficult to understand. They were all submitted to the jury by the learned

trial judge in a charge which, as it seems to us, was a very clear, impartial, complete and perfectly correct presentment of all the matters, both of law and fact, involved in the controversy. In a brief way, it may be said that the substance of the contention turned upon the question as to which one of two innocent persons should suffer a loss occasioned by the dereliction of another, and the solution of that question depended upon the further question, whether the person in default was the agent of the mortgagee or of the mortgagor in receiving and disposing of the moneys paid by the mortgagor in extinguishment of the debt for the security of which the mortgage was held. Substantially the facts were that Joseph McParland, with whom his brother John McParland was interested, held certain city contracts for the construction of sewers in various parts of Philadelphia, and being in want of money with which to prosecute the work John McParland, one of the defendants, applied to Mr. Gustav R. Schaefer, a member of the bar and a personal friend, to obtain a loan for the amount needed. Mr. Schaefer undertook to raise the money, and did so, to the extent of $11,000, in all. The person from whom the money was obtained was Mr. August F. Brecht, who was a personal friend and also a professional client of Mr. Schaefer. Mr. Brecht and Mr. McParland did not meet during the negotiations, nor were they ever brought together until a considerably later time, and after the transactions were all completed. In point of fact, the money was paid by Mr. Brecht to Mr. Schaefer in various sums, and at various times, ranging from August 10, 1893, to November 7 following, and in March, 1894. Sums of money were advanced at various times by Schaefer to McParland, largely in excess of $11,000, the particulars of which appear in a paper marked exhibit "A," which was given in evidence but not printed, and hence it is not before us. But some idea may be had of their amount and the time of their receipt and repayment by another paper which was given in evidence, and is printed. By that paper it appears that Schaefer advanced in all to McParland from August 12, 1893, to August 21, 1896, $22,359.04, and received from him during the same time in money $8,070, and in city assessment bills for work done in building sewers an aggregate amount of $16,080.06. These transactions were between Schaefer and McParland, and

among them were embraced the money which Schaefer had received from Brecht and had advanced to McParland. It does not seem that any separate or independent account was kept of the sums received by Schaefer from Brecht, as forming a distinct and separate class of transactions, nor does it appear that the very moneys received by Schaefer from Brecht were specifically turned over to McParland. On the contrary, the account of money paid by Schaefer to McParland is in smaller and more numerous sums, and, at different dates, from those which were paid by Brecht to Schaefer. In other words, it is perfectly apparent that the moneys which Schaefer advanced to McParland were not the identical moneys which Schaefer received from Brecht, but were casual sums which Schaefer advanced at many different times in odd amounts. Thus, on September 15, 1893, he advanced the sum of $299.04, and on September 26, 1893, one sum of $50.00 and another of $150. The aggregate of all the sums advanced by Schaefer to McParland between August 12, and November 10, 1893, was $9,909.04, whereas, during that time he had received in the aggregate from Brecht but $8,000. Up to the end of March, 1894, the total advances made by Schaefer to McParland amounted to $17,564.04, and he had received from McParland during that time in money $1,200. As the dates at which assessment bills were turned over by McParland to Schaefer are not furnished to us we cannot state them, but it is not of so much importance, as the object of this presentment is rather to show the character of the transactions between Schaefer and McParland than the particular items of Brecht's transactions with Schaefer. It is unfortunate that the paper marked exhibit " A " has not been printed, as it would doubtless have furnished more precise information upon this subject.

The next matter of importance to be considered is the character of the mortgages which were ultimately assigned to Brecht. They were two in number, both dated July 1, 1893, one for $5,000, and the other for $4,000, both made to Alfred E. Lowrey, to secure the payment of bonds of corresponding amounts and dates at five years after date. The mortgage in suit in this case is the one for $5,000. Both of these mortgages were assigned by Lowrey to Philip L. Schaefer on February 19, 1894, and they were not assigned to Brecht until February 24, 1896,

which was long after the payment of the several sums of money which Brecht paid to Schaefer. The explanation of this rather unusual state of facts is substantially this: McParland was in need of money in 1893, with which to carry on the construction of sewers, and he applied to Mr. Erricson to obtain the money for him. Erricson directed that one or more mortgages should be executed by McParland and his wife to be used in obtaining the loans, and accordingly both the mortgages for $5,000 and $4,000 were prepared and executed, and placed with Erricson for the purpose of raising money on them. The mortgagee named in the instrument was Alfred E. Lowrey, a clerk in Erricson's office, who testified that he furnished no money for the mortgages. His name was used as mortgagee only for convenience, as he had no interest in the mortgage. Erricson's efforts to raise money failed of success, and then McParland applied to Mr. Gustav R. Schaefer, and he undertook to furnish the needed money. This was done by his applying to one of his clients, Mr. August F. Brecht, who agreed to advance money to the amount of $11,000 in all. The mortgages were transferred by Mr. Lowrey to Philip F. Schaefer, a relative of Gustav R. Schaefer, in February, 1894, and he also had no interest in them and furnished no money on them, but simply held the legal title in them for the time being. He in turn assigned them to Mr. Brecht when instructed so to do, but it was not until in February, 1896. During all this time the transactions between Brecht and G. R. Schaefer and between G. R. Schaefer and McParland were proceeding. Brecht paid to Schaefer in 1893 and March, 1894, money in various sums to the amount of $11,000, and Schaefer paid to McParland moneys altogether amounting to $18,664.04, which included the $11,000 received by Schaefer from Brecht. Mr. Schaefer was examined as a witness and testified that he thought he told McParland that the name of the gentleman who was advancing the money was August F. Brecht, but was not positive about it. He was asked: "Q. What was the arrangement made by which Mr. Philip L. Schaefer was to hold the mortgages to secure these advancements, so far as the repayment of the advancements was concerned? A. Only as security for such amounts as Mc-Parland would owe on this account. Q. Did you see Mr. Brecht in consequence of this arrangement made between you

and Mr. McParland? A. I didn't tell Mr. Brecht of these mortgages. I simply held them as security. He didn't inquire for them. I told him though that he was secured." He was also asked : " Q. What amount of assessment bills were given to you in payment of the loans which were made? A. Mr. McParland handed to my clerk, Frederick J. Schaefer, quite a number of assessment bills, amounting to $11,945.86, as I understood it. I have since learned by memoranda that I have seen in the handwriting of Frederick J. Schaefer that that amount is not the full amount of the assessment bills which Mr. McParland handed him for me. . . . Q. Tell us please for what purpose those bills were given to you? A. In payment of moneys advanced to Mr. McParland on behalf of Mr. Brecht. . . . Q. You want us to understand that Mr. Brecht did not inquire how he could be secured for the repayment of this money, when you asked him to lend it to Mr. McParland? A. Not other than I have mentioned. Q. You never mentioned anything to him you say about mortgages? A. No; because I simply treated the mortgages as an extra collateral, in the event of the taking of these bills by Mr. McParland for his own use or elsewhere. Q. You mean to say then that you were to have, and were to be the medium though which Mr. McParland was to be, furnished the money by Mr. Brecht for the prosecution of these contracts? A. Yes, sir. Q. You were to be the medium? A. Yes, sir. Q. And that you were also to be the party to whom Mr. Brecht was to look exclusively for the return of his money? A. He was to look to me because he said, 'I look to you and I don't look to Mr. McParland, because I gave the money to you and I want you to get it from Mr. McParland.' Naturally, I collected it from Mr. McParland for Mr. Brecht. Q. Who advised the assignment from Mr. Philip L. Schaefer to Mr. Brecht? A. I did. Q. Why did you do that? A. Because Mr. Brecht became dissatisfied with the nonpayment of the principal due him, and I told him, as I understood from my accounts, McParland owed me for Mr. Brecht a sum equivalent to $11,000, and I therefore directed Mr. Philip L. Schaefer to assign the mortgages to Mr. Brecht. . . . Q. And at the time that you assigned these mortgages to him (Brecht) you believed they were a perfectly valid security? A. Unquestionably, and that Mr. McParland at that time owed that much

money to secure Mr. Brecht, which I have since found out was not the fact. . . . Q. Did you fully inform Mr. Brecht of what the contract between you and Mr. McParland was? A. No, only in this respect that I told him that the money was secure. Q. You did not tell Mr. Brecht then that the agreement between you and Mr. McParland was that you were to secure the lender of the money by assigning to him these mortgages? A. No, I did not say that. Q. And you did not tell Mr. Brecht that the agreement between you and Mr. McParland was that, although you were getting this money from Mr. Brecht for Mr. McParland, when Mr. McParland came to return the money he was to return it to you for Mr. Brecht; did you tell that to Mr. Brecht? A. Yes, sir. Q. You told him that? A. I told him I was to get the money from Mr. McParland to pay him."

There was considerable testimony in addition to the foregoing and to a similar effect, not only from Mr. G. R. Schaefer, but from others. The only object of presenting these citations is to show that there was testimony in the cause proving, and tending to prove, that Schaefer was acting as the agent of Brecht, both in receiving the money from Brecht, and in receiving the money from McParland to pay Brecht. It was upon this point that the case turned, and the jury found that such was the fact. In our view there was abundant testimony to justify this finding. The whole character of the transaction, and the manner in which it was conducted, fully accord with this theory. Brecht and McParland were not brought together at all. Everything was done through Schaefer. It was he who obtained the money from Brecht. It was from Schaefer that McParland received the money, and to him he assigned the assessment bills for the very purpose of enabling Schaefer to collect the money with which to pay Brecht. As a matter of fact, McParland himself collected the most of it and paid it to Schaefer until the whole amount of the money advanced by Brecht was repaid by McParland. And all of this took place before the mortgages were assigned to Brecht. They were only assigned because Schaefer at that time supposed that McParland still owed the whole $11,000 which had been advanced to him by Schaefer. But this was a mistake as Schaefer subsequently discovered. It was already paid to his authorized clerk by McParland, and he,

Schaefer, was responsible for it to Brecht, and he so testifies. The assignment of the mortgages to Brecht was no part of the original transaction.   They were only intended as a last resort, in case the assessment bills were not collected, but they were collected and the whole amount of the money paid by Brecht to Schaefer was already paid by McParland to Schaefer before the assignment of the mortgages to Brecht was made.   The conclusion is irresistible that Schaefer was acting as the agent of Brecht, both in receiving the money from Brecht for Schaefer, and in receiving the money from McParland for Brecht.   Even Brecht himself testified to that effect.   He was asked, "Q.   Did you have anything to do with the account between McParland and Schaefer?   Were you to have anything to do with the account between McParland and Schaefer?   A. McParland was to deliver the money to Schaefer and Schaefer was to deliver the money to me."

Unfortunately Schaefer's clerk embezzled the whole of the money without Schaefer's knowledge, and for that embezzlement Schaefer was responsible, as between Brecht and McParland, and this responsibility he cheerfully assumed in his testimony. But it was the act of Brecht in permitting the transaction to be conducted in that way which gave the opportunity for the commission of the embezzlement, and, under the decisions, this subjects him to the loss, as between him and McParland.   We are of opinion that the answers of the court below to the plaintiffs' points were correct, and that the whole charge was a careful and accurate presentation of the very question upon which the case turned.   The assignments of error are all dismissed.

Judgment affirmed.